Whitney E. Street (SBN 223870)
**Block & Leviton LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 968-1852 phone
(617) 507-6020 fax
whitney@blockleviton.com

Jacob A. Walker
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jake@blockleviton.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Mark Habelt, individually and on behalf of all others similarly situated,<br><br>　　Plaintiff,<br><br>v.<br><br>iRhythm Technologies, Inc. and Kevin M. King,<br><br>　　Defendants. | Case No. _____<br><br>**Class Action Complaint for Violations of the Federal Securities Laws**<br><br>**Jury Trial Demanded** |

Plaintiff, Mark Habelt, ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

**Nature and Summary of the Action**

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired iRhythm Technologies, Inc. ("iRhythm" or the "Company") common stock between August 4, 2020 and January 28, 2021, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. According to its most recent Annual Report filed on Form 10-K with the SEC, iRhythm is a digital healthcare company that seeks to "redefin[e] the way cardiac arrythmias are clinically diagnosed by combining [the Company's] wearable biosensing technology with cloud-based data analytics and deep-learning capabilities." iRhythm offers a portfolio of ambulatory cardiac monitoring services on its platform, called the Zio service. iRhythm common stock trades on the NASDAQ stock exchange under the ticker symbol "IRTC." The Company is headquartered in San Francisco, CA.

3. iRhythm receives revenue for its Zio service primarily from third-party payors, which include commercial payors and government agencies, such as the U.S. Centers for Medicare and Medicaid Services ("CMS"). Reimbursement from the CMS and other third-party payors is therefore critical to the Company's business.

4. On August 3, 2020, the CMS announced its Calendar Year 2021 Medicare Physician Fee Schedule Proposed Rule, which would update payment policies, payment rates, and other provisions for services furnished under the Medicare Physician Fee Schedule on or after January 1, 2021.

5. On August 4, 2020, iRhythm held a conference call with stock market analysts to discuss the impact of the CMS' proposed rule on the Company's business. On this call, Defendant Kevin M. King, then President and CEO of iRhythm, discussed at length how the Company "worked hand-in-hand with the various governing bodies . . . in drafting and constructing" the language used in the CMS' proposed rule, and that the Company was "well aware and well informed" of the proposed CMS rules. As set forth in greater detail below, Defendant King praised

the impact the proposed rule would have on iRhythm's business and revenues, stating that "[i]f we were to apply the new codes and proposed rates, our 2019 revenues would increase slightly," and that "our total business will be up slightly overall."

6.  The market reacted positively, with shares immediately jumping from the August 3, 2020 close of $127.46 per share to an August 5, 2020 close of $190.09 each.

7.  The truth began to be revealed on December 1, 2020, when the CMS issued its final rule, which finalized the codes as anticipated, but did not finalize national pricing for certain products and services offered by iRhythm. Shares opened on December 2, 2020 at $183.00 each, down from the December 1, 2020 close of $240.64.

8.  Nevertheless, on December 2, 2020, the Company continued to mislead investors. iRhythm held a call with analysts that day to discuss CMS' final rule, and despite the lack of national pricing in CMS' final rule, Defendant King stated that "I don't think this is going to be terribly disruptive to us," that "I'm not expecting this to be considered a rate cut," and at worst, "we should stay were we are" in terms of reimbursement rates.

9.  Then on January 29, 2021, Medicare Administrative Contractor Novitas Solutions published actual reimbursement rates under the CMS' 2021 Medicare Physician Fee Schedule. A Baird analyst commented that these rates were "way lower than" the former codes, citing one example where iRhythm was previously reimbursed around $311, but was now receiving just $42.68.

10. On this news, the price of iRhythm common stock closed at $168.42, down approximately 33% from its January 28, 2021 close of $251.00. Shares traded intraday as low as $135.65 each. The 33% drop represents a one-day loss in market capitalization of approximately $2.4 billion.

11. Throughout the Class Period and in violation of the Exchange Act, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts to investors. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) iRhythm's business would suffer as a result of the CMS' rulemaking; (2) reimbursement rates would in fact plummet; (3) a lack of national pricing in the CMS rule and fee schedule would

cause uncertainty and weakness in the Company's business; and (4) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

12. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Jurisdiction and Venue**

13. The federal law claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, § 27 of the Exchange Act, 15 U.S.C. § 78aa.

15. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

17. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**Intradistrict Assignment**

18. Pursuant to Local Rule 3-2(c), this is a securities fraud class action to be assigned on a district-wide basis. Defendant iRhythm Technologies, Inc. is headquartered in San Francisco, CA, which is within the San Francisco/Oakland Division.

**Parties**

19. Plaintiff Mark Habelt, as set forth in his Certification filed contemporaneously herewith, acquired shares of iRhythm common stock at artificially inflated prices, and has been damaged.

20. Defendant iRhythm Technologies, Inc. is incorporated under the laws of the State of Delaware, with its principal place of business at 699 8th Street, Suite 600, San Francisco, CA 94103. Its common stock trades on the NASDAQ stock exchange under the symbol IRTC.

21. Defendant Kevin M. King was, from July 2012 until approximately January 12, 2021, iRhythm's President, Chief Executive Officer, and a member of the Company's Board of Directors. Mr. King remains a member of the Company's Board of Directors.

22. Defendants King is named as a Defendant for violations of all counts asserted herein, and is sometimes referred to as the "Individual Defendant." The Individual Defendant, because of his positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and the investing public, *i.e.*, the market. The Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material, non-public information available to him, the Individual Defendant knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendant is therefore liable for the misstatements and omissions plead herein.

**Substantive Allegations**

23. According to its most recent Annual Report filed on Form 10-K with the SEC, iRhythm is a digital healthcare company that seeks to "redefin[e] the way cardiac arrythmias are clinically diagnosed by combining [the Company's] wearable biosensing technology with cloud-

based data analytics and deep-learning capabilities." iRhythm offers a portfolio of ambulatory cardiac monitoring services on its platform, called the Zio service.

24. iRhythm was incorporated in Delaware on September 14, 2006. The Company is headquartered in San Francisco, CA.

25. iRhythm receives revenue for its Zio service primarily from third-party payors, which include commercial payors and government agencies, such as the CMS. Reimbursement from the CMS and other third-party payors is therefore critical to the Company's business.

26. On August 3, 2020, the CMS issued its Calendar Year 2021 Medicare Physician Fee Schedule Proposed Rule, which would update payment policies, payment rates, and other provisions for services to be furnished under the Medicare Physician Fee Schedule on or after January 1, 2021. According to an August 4, 2020 iRhythm press release, the CMS' proposed rule "includes two new Category I Current Procedural Terminology ("CPT") code sets related to long term continuous electrocardiogram ("ECG") monitoring and recording. Category I CPT codes 93XX0 – 93XX7 will replace Category III temporary CPT codes 0295T – 0298T as the primary codes that iRhythm uses to seek reimbursement for its Zio XT service. For these and other CPT codes, the Proposed Rule establishes Relative Value Units ("RVUs") for Work, Practice Expense and Malpractice components that are adjusted by Geographical Practice Cost Indices that account for geographic cost variations and then multiplied by an annually updated Conversion Factor that converts the RVUs to payment rates."

**Defendants' False and Misleading Statements and Omissions**

27. The Class Period begins on August 4, 2020, when iRhythm held a conference call with analysts to discuss the newly-released CMS proposed rule. On this call, Defendants made several misrepresentations.

28. In his opening remarks, Defendant King stated:

> For our direct bill contracted revenue, which represents contracts with third-party payers with a range of negotiated rates, the majority of our revenue in this category are contracts with negotiated rates that are not indexed to CMS rates or contracts that have already been negotiated. For the remaining portion of our direct bill contracted revenue, the contracts contain what is called default language, which determines the payment rate in the case of a code change. Within these subgroup

of payers, in some cases, the new rate will be above existing rates, and in some cases, the new rate will be below existing rates. The net impact of these contracts, along with the change in CMS revenue, are included in the estimated revenue impact provided earlier.

***Looking ahead, we believe that the new national CMS pricing, there are a number of additional tailwinds and opportunities for iRhythm that may lead to higher volumes and higher revenue over time.*** Category I CPT codes are associated with clinical validation of a new technology, which may improve patient access and physician willingness to adopt the technology. In addition, with national pricing, we have the added flexibility and benefit of utilizing all of our 3 IDTFs, allowing us to scale our clinical operations in certain geographies. And finally, there are other entirely new sources of potential revenue that we can now pursue, including contracting from Medicaid and potentially billing for our home enrollment service.

In closing, ***we're pleased that the proposed rates reflect the significant clinical value of long-term continuous cardiac monitoring***. We expect the rates to become final in December and go into effect next January. We will be sharing updates between now and January, if any, as appropriate. And most importantly, we're excited about the transition to a permanent code and the increased access this will bring patients. We're looking forward to continuing the work of delivering our ZIO service to the millions of patients who benefit from it.

29. An analyst asked Defendant King whether "in 2021, you do think third-party commercial payers as of Jan. 1 will honor the CMS expanded rates?" Defendant King replied:

Yes. Maybe I could just unpack that a little bit. So contracted -- commercial plans, whether they're contracted or not, are typically not indexed to CMS rates in our view. I would say that, over the past year, we've been working with many of our contracted payers, and some of them have agreed to move to the new code set for billing purposes, keeping our payment structure the same given that they're not indexed. But the 0297T family of codes goes away and a new code set comes in, so they have to update their billing system. In the case where they aren't indexed, we feel that we're in a stronger position relative to these plans because there's a higher RVU that puts us in a stronger negotiating position relative to those contract plans. In some cases, commercial contract plans have predetermined indices relative to CMS pricing or RVUs. In some cases, it's below. In some cases, it's above. And it's sort of a starting point for negotiation, if you will. ***And when we net all of those factors out, we think, in total, our business will be up slightly overall.***

30. Also on this August 4, 2020 call, a Citigroup analyst offered her "[c]ongratulations" to the Company, and then asked whether "there was anything that surprised you when you saw these final codes?" as well as "is there anything in the codes that makes you change your business model?" Defendant King responded:

>No, there's nothing about the code language that is surprising. As we described on previous calls, ***we worked hand-in-hand with the various governing bodies, AMA, ACC, HRS, in drafting and constructing that code language***. So ***we were well aware and well informed***, and we think this best represents the interest of patients, providers, service providers like ourselves in the industry. Anything surprising here, look, I think at the highest level, ***the movement to a Category I is validating and great news for the company. It's a positive in all directions. It's positive for customers, it's positive for patients, and it's positive for the company***. The initial ruling is highly favorable in that our relative value unit is increased compared to where it was as a calculated value. The conversion factor going down is not so much a surprise, although it's enumerated as a percentage now. But we did know that the physician payment for evaluation and management was likely to go up in the coming year. And the way CMS operates in a balanced budget, other things would have to change. So this is related to all CPT codes will be reduced by some percentage. ***And the fact that we're coming out of this net positive despite a nearly 11% of decline in the conversion factor, I think, is really validating from the standpoint of the uniqueness and value of our service. So it's probably more validation but not a surprise.***

31. On August 6, 2020, iRhythm held a call with analysts to discuss the Company's second quarter 2020 financial results. On this call, Defendant King stated: "After several years of collaboratively working with the [AMA], the Heart Rhythm society the American College of Cardiology and the CMS staff, ***we are pleased with the very positive impact the proposed outcome will have on our business and especially to have such a significant milestone successfully behind us.***"

32. On August 11, 2020 – after the Company's stock was soaring – iRhythm filed a Registration Statement on Form S-1 with the SEC seeking to offer to the public an undisclosed amount of the Company's common stock. In this Registration Statement, iRhythm included a section entitled "Reimbursement Update," which provided:

>In early August, the Centers for Medicare and Medicaid Services, or CMS, published the Medicare Physician Fee Schedule Proposed Rule for 2021, or Proposed Rule, and accompanying Addenda. The Proposed Rule and accompanying Addenda update payment policies, payment rates, and other provisions for services furnished under the Medicare Physician Fee Schedule, or PFS. The Proposed Rule release is followed by a public comment period that will close on October 5, 2020 and will culminate in CMS' release of the Final Rule, which is expected to be announced on or around December 1, 2020 for implementation on January 1, 2021. The Proposed Rule is therefore subject to change. The Proposed Rule and accompanying Addenda include payment rates for two new Category I Current Procedural Terminology, or CPT, code sets related to

long term continuous ECG monitoring and recording. Category I CPT codes 93XX0 – 93XX7 will replace Category III temporary CPT codes 0295T – 0298T as the primary codes that iRhythm uses to seek reimbursement for its Zio XT service. The eight new Category I CPT codes were split between two sets of four with rates tied to wear-time of greater than 48 hours and up to 7 days, and for greater than 7 days up to 15 days. These additional codes were established to define the associated time and work to monitor, detect and identify cardiac disease over longer periods of time which has been shown to lead to higher detection rates. At this time, the Company expects that the new CPT codes will be adopted by all U.S. payors for reporting purposes beginning January 1, 2021 when the new codes become effective, at which point the Company expects the Zio service will become eligible for reimbursement under the new Category I CPT codes.

33. After an amendment, the SEC declared the Registration Statement effective on August 18, 2020, and on August 19, 2020, iRhythm filed its final prospectus with the SEC on Form 424B4. The Company was offering 1,093,167 shares at $175.00 each for total proceeds of over $191 million. The final prospectus contained a "Reimbursement Update" similar or identical to that included in Registration Statement as alleged above.

34. On August 21, 2020, iRhythm announced that the offering had closed. Including the 163,975 shares sold via options exercised by the underwriters of the offering, iRhythm received $206.2 million, after deducting discounts, commissions, and expenses.

35. On November 5, 2020, iRhythm held a call with analysts to discuss the Company's third quarter 2020 financial results. On this call, Defendant King stated:

> Regarding 2021 reimbursement and volume, I think on reimbursement or pricing side, if you will, the data that we gave at the time of the initial ruling, I guess, the RVU, and we did the backwards walk to 2019, same mix and so forth was, I think, high single digit delta on price. I think that still continues to make sense. The progress that we're making with our commercial contract conversions, be they indexed or nonindexed, is very much in line with where we were with what we had stated before. So I feel comfortable with that number.

36. The statements in ¶¶ 28-32, 35 were materially false and misleading and omitted to disclose material information. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) iRhythm's business would suffer as a result of the CMS' rulemaking; (2) reimbursement rates would in fact plummet; (3) a lack of national pricing in the CMS rule and fee schedule would cause uncertainty and weakness in the Company's business; and (4) as a result of

the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

37. Defendants knew, or in reckless disregard for the truth should have known, that at the time the statements in ¶¶ 28-32, 35 were made, they were false and/or misleading, and/or failed to disclose material information to investors.

### Additional Misstatements and The Truth Emerges

38. On December 1, 2020, the CMS issued its Calendar Year 2021 Medicare Physician Fee Schedule Final Rule, which established payment policies, payment rates, and other provisions for services furnished under the Fee Schedule on or after January 1, 2021. According to a press release issued by iRhythm before the market opened on December 2, 2020:

> The Final Rule describes two new Category I Current Procedural Terminology ("CPT") code sets related to long term continuous electrocardiogram ("ECG") monitoring and recording. Category I CPT codes 93241 – 93248 will replace Category III temporary CPT codes 0295T – 0298T as the primary codes that iRhythm uses to seek reimbursement for its Zio XT service. The eight new Category I CPT codes were split between two sets of four with rates tied to wear-time of greater than 48 hours and up to 7 days, and for greater than 7 days up to 15 days. These additional codes were established to define the associated time and work to monitor, detect and identify cardiac disease over longer periods of time which has been shown to lead to higher detection rates. At this time, the Company expects that the new CPT codes will be adopted by all U.S. payors for reporting purposes beginning January 1, 2021 when the new codes become effective.
>
> In the Final Rule, CMS did not finalize national pricing for the extended external ECG patch, medical magnetic tape recorder (SD339) supply, and ruled to contractor price CPT codes 93241, 93243, 93245 and 93247. iRhythm will be working with Medicare Administrative Contractors (MACs) to establish pricing for these codes.

39. The market began to digest what this development meant for iRhythm's business: without national pricing as part of the CMS rule, tremendous uncertainty surrounded the reimbursement rates iRhythm would receiving beginning in 2021. Shares opened on December 2, 2020 at $183.00 each, down from the December 1, 2020 close of $240.64.

40. Nevertheless, the Company continued to mislead the market by assuring investors that the final rule and fee schedule would not negatively impact iRhythm's business. On December 2, 2020, iRhythm held a call with analysts to discuss the CMS rule and fee schedule. On this call,

Defendant King stated that he remained "confident" and "bullish" about the impact the rule would have. King stated:

> While we were expecting a national pricing decision, it's very important to note, this is not a rate cut, rather, a rate increase was not approved and the changes relate to roughly 1/4 of our revenue. We believe a local contracting path is an attractive and familiar option for the company and leverages the long-standing working relationships we have with several local contractors. Separate but related, we believe our commercial contract pricing is unaffected, as is our ability to pursue Medicaid contracting and reimbursement for our home enrollment service. And most importantly, the clinical validation that is associated with the category I code -- CPT codes remain, and we believe this positions us well to improve patient access and physician willingness to adopt the technology.

41. Defendant King also stated:

> Yes. As I said earlier, I don't believe this is going to be a challenging process. It is going to take some time. And as I said in the prepared remarks, we're going to work on that, and it's going to take a few months. But aside from that, I think this should be fairly straightforward conversation. The data is already available. The relationships are in place with numerous local carriers, and we'll try to contract with as many as possible to establish the right pricing level. ***And I don't -- and it's about 1/4 of our business. I don't see any impact to volume. I don't see any impact to commercial contracting rates so aside from the few months to get in line with the local carrier pricing calendars, I don't think this is going to be terribly disruptive to us.***

42. King further said on this December 2, 2020 call:

> Well, I think it depends on whether you're talking about a temporary code or a permanent code, Margaret. In the work that we did initially with Novitas on a temporary code basis, as we've described before, we needed to put together what we believe where to practice expense inputs. And that's where we arrived at, I think at the time, it was $311. It's since increased from that to about $320. Now that there's a permanent code in place. There's no question that the technology is validated, if you will. It's not experimental. It's not investigational. So this -- from a contracting standpoint, ends up becoming the same valuation exercise. And from our perspective, the initial ruling is going to help us here because all of that work was done by the RUC as the governing body. And I think that, that's a good starting point for us to go to the conversations with them about this. So I think -- I'm hoping it's going to be more conversational than it's going to be contentious in any way. And again, the 5 to 7 years of experience, I guess it's now 7 years of experience that we have with them, I think will help as well. This is not like we're an unknown entity. ***So I'm not expecting this to be considered a rate cut. I think this -- the way for all of us to be thinking about this is that we were hoping for a rate increase that was not approved so minimally, we should stay where we are, and we're***

*going to go for -- swing for the fences, if you will, in terms of our ability to apply the RVUs that were generated out of the initial process.*

43. King continued:

> The validation process associated with Category I code remains. And we think this does help patient access, and it does help physician willingness to adopt the technology. We've commented on that previously. While it may be at the margin, it is positive, and it does signal a validation of the technology without a doubt. This is not something after millions and millions of tests are done that's experimental investigational nor lacking evidence, it's one that is validated that's struggling as a category to fit into, to fit into like I wooden shoe, right? The wooden shoe doesn't flex maybe is the way to think about it from my days of working in the Netherlands. But nonetheless, it's one that we'll benefit from for certain.

44. One analyst asked "how does this impact your relationships with private payers and/or sort of the balance of your revenue base?" Defendant King replied:

> I don't believe it does. And we've commented on this in the past when we described the initial ruling or the benefits of the initial ruling where we said crosswalking the 2019 revenue to the initial ruling would take us up in high single digits, and that was largely CMS. And we did not believe that the commercial contracts that we have in place would largely be affected mostly because they were already paying higher than where we were and higher than the initial ruling ones. So I'm not overly concerned about that. Many of these contracts are already completed and have been crosswalked to the existing commercial rates that we have. So I'm feeling pretty confident about that. There is the benefit of the permanent code allowing us now to go after Medicaid state level pricing or contracting.

> Also, the home enrollment for hook-up is now a permanent code in and it is valued as well. So that can be used for us. And I think those are 2 additional side benefits that will flow to the business over time.

45. On December 14, 2020, iRhythm announced that Defendant King was retiring from his position as President and CEO of the Company, effective January 12, 2021. The Company stated that King would remain on the Board of Directors.

46. Then on January 29, 2021, Medicare Administrative Contractor Novitas Solutions published actual reimbursement rates under the CMS' 2021 Medicare Physician Fee Schedule. A Baird analyst commented that these rates were "way lower than" the former codes, citing one example where iRhythm was previously reimbursed around $311, but was now receiving just $42.68. The Baird analyst added that "[t]his is a massive slash on the face in the most important MAC jurisdiction for iRhythm."

CLASS ACTION COMPLAINT

47. On this news, the price of iRhythm common stock closed at $168.42, down approximately 33% from its January 28, 2021 close of $251.00. Shares traded intraday as low as $135.65 each. The 33% drop represents a one-day loss in market capitalization of approximately $2.4 billion.

48. The statements in ¶¶ 28-32, 35, and 40-44 were materially false and misleading and omitted to disclose material information. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) iRhythm's business would suffer as a result of the CMS' rulemaking; (2) reimbursement rates would in fact plummet; (3) a lack of national pricing in the CMS rule and fee schedule would cause uncertainty and weakness in the Company's business; and (4) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

49. Defendants knew, or in reckless disregard for the truth should have known, that at the time the statements in ¶¶ 28-32, 35, and 40-44 were made, they were false and/or misleading, and/or failed to disclose material information to investors.

50. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of iRhythm's common stock, Plaintiff and other members of the Class have suffered significant losses and damages.

**Class Action Allegations**

51. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired iRhythm common stock between August 4, 2020 and January 28, 2021, inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

52. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

53. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a. Whether the Exchange Act was violated by Defendants;

    b. Whether Defendants omitted and/or misrepresented material facts;

    c. Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e. Whether the price of the Company's stock was artificially inflated; and

    f. The extent of damage sustained by Class members and the appropriate measure of damages.

54. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

55. Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**Fraud on the Market**

57. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

    a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b. The omissions and misrepresentations were material;

    c. The Company's common stock traded in efficient markets;

  d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

  e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts.

58. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## No Safe Harbor

59. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

60. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## Scienter Allegations

61. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendant, by virtue of his receipt of information reflecting the true facts regarding iRhythm, his control over, and/or receipt and/or modification of iRhythm's allegedly materially misleading misstatements and/or his

associations with the Company which made him privy to confidential proprietary information concerning iRhythm, participated in the fraudulent scheme alleged herein.

### Loss Causation

62. On December 1, 2020, the CMS issued its Calendar Year 2021 Medicare Physician Fee Schedule Final Rule, which established payment policies, payment rates, and other provisions for services furnished under the Fee Schedule on or after January 1, 2021. iRhythm stock opened at $183.00 per share on December 2, 2020, down approximately 24% from the December 1, 2020 closing price of $240.64.

63. Then on January 29, 2021, Medicare Administrative Contractor Novitas Solutions published actual reimbursement rates under the CMS' 2021 Medicare Physician Fee Schedule. A Baird analyst commented that these rates were "way lower than" the former codes, citing one example where iRhythm was previously reimbursed around $311, but was now receiving just $42.68.

64. On this news, the price of iRhythm common stock closed at $168.42, down approximately 33% from its January 28, 2021 close of $251.00. Shares traded intraday as low as $135.65 each. The 33% drop represents a one-day loss in market capitalization of approximately $2.4 billion.

### Causes of Action

### Count One

**Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

65. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose the material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

67. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact

and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## Count Two

## Violations of § 20(a) of the Exchange Act

### (Against the Individual Defendant)

69.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70.     The Individual Defendant acted as a controlling person of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions at the Company, the Individual Defendant had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendant was provided with or had unlimited access to the documents described above which contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## Prayer for Relief

Plaintiff prays for relief and judgment as follows:

a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

CLASS ACTION COMPLAINT

b) awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post- judgment interest thereon.

c) awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d) awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## Jury Demand

Plaintiff demands a trial by jury in this action of all issues so triable.

February 1, 2021

Respectfully submitted,

**Block & Leviton LLP**

/s/ Jacob A. Walker
Jacob A. Walker (SBN 271217)
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jake@blockleviton.com

Whitney E. Street (CA Bar No. 223870)
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 968-1852 phone
whitney@blockleviton.com

*Attorneys for Plaintiff*